*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TOMMY EDWARD RICHARDS,

Defendant-Appellant.

UNPUBLISHED
September 2, 2021

No. 353247
Berrien Circuit Court
LC No. 1987-001623-FH

Before: RONAYNE KRAUSE, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

In 1987, a jury convicted defendant of first-degree felony murder, MCL 750.316. Defendant was a 17-year-old juvenile at the time of the charged offense. After defendant was convicted, the trial court sentenced him to mandatory life imprisonment without the possibility of parole. In February 2020, following a hearing pursuant to *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and MCL 769.25a, the trial court resentenced defendant and again imposed life without parole. Defendant appeals that sentence as of right. We affirm.

## I. BACKGROUND

On April 20, 1987, the victim, 10 years old, lived in Benton Harbor, Michigan. That day, along with her five siblings, the victim went to a neighbor's house to play. A neighbor watched the children as they played outside. The neighbor testified that she saw defendant, who also lived on the street, interacting with the children. The neighbor testified that, at one point, it looked like defendant was "trying to shake [the victim's] hand." A witness heard defendant state to the victim, "I'm going to get something under [your] dress." The victim told defendant "no." Defendant then asked someone to bring him a plastic bag. Someone did, and defendant placed it under his coat. Defendant picked up a plastic truck that the victim's brother was playing with. He then took the truck with him as he went behind his house. Several boys and the victim followed defendant. The boys eventually came back; the victim did not. Loud "booms" were heard coming from inside defendant's house.

In defendant's appeal from his convictions, this Court stated:

The victim was last seen alive during the evening of April 20, 1987. On May 4, 1987, a searcher discovered the victim's body wrapped inside a number of plastic garbage bags on a vacant lot near the location where she had last been seen. Although fully clothed, the victim's leotards and panties had been torn across the front from leg to leg. The pathologist determined that the victim had vomited while still alive and that the probable cause of death was suffocation resulting from the victim breathing in regurgitated food particles. There was also a bruise and tear in the vaginal opening and the victim's three front teeth had been knocked loose. [*People v Richards* (*Richards I*), unpublished per curiam opinion of the Court of Appeals, Docket No. 105763, decided June 12, 1990, unpub op at p 1.]

The pathologist also opined that the victim had been sexually assaulted. The pathologist stated that the victim's vomiting could have been caused by blows to her stomach, restraint to her abdomen, or suffocation.

This Court further stated:

The circumstances surrounding the victim's death and disappearance were disputed. Two weeks after the body was found, the police contacted defendant who had been seen with the victim near the time of her disappearance. Defendant agreed to be questioned by the police and was advised of his "Miranda" rights. Officer Ruhl testified that defendant originally denied having any knowledge concerning the victim's death, but then changed his story after being confronted with various inconsistencies in his statements. Ruhl said the defendant then told him that he had had oral sex with the victim outside his house, left and went inside for a couple of minutes, and then returned to discover the victim's body lying on the ground unconscious. Next, Ruhl said defendant told him that he panicked, put the victim's body in several garbage bags, and then placed the body in the vacant lot down the street. Defendant's statements were obtained on both videotape and in his own writing.

Following the defendant's statements, a search warrant was obtained which led to the discovery of one of the victim's shoes in the basement of defendant's home. When confronted with this information, Officer Ruhl testified that defendant originally denied any knowledge of the shoe, but later said he had discovered it the next day and had brought it in the house intending to burn it. At this time, Ruhl said defendant also admitted to having had intercourse with the victim prior to the oral sex. These later statements were obtained on audio tape. The videotape, audiotape and written statement were all presented to the jury.

When defendant testified, he admitted giving the incriminating statements to the police, but claimed they were untrue. Defendant said the statements were based on information fed to him by the police, and that he said them because, based upon comments by Officer Ruhl, he was led to believe he could go home if he told the police what they wanted to hear.

At trial, defendant testified that he had seen the victim performing what appeared to be oral sex on [RL] in a nearby alley three days before the day she disappeared. [RL] was the father of two other children of the victim's mother. Although defendant denied having had sex with the victim he said the victim did agree to have sex with his thirteen-year-old[1] cousin after his cousin threatened to tell the victim's mother about the alleged incident with [RL]. According to the cousin, the two of them went down to the basement, but did not actually have any sex because the victim's brothers and sisters came to the door looking for her. The cousin said the victim then ran upstairs, leaving one of her shoes behind, and that he left a few minutes later. According to the defendant, the victim then came back shortly thereafter with [RL], who demanded to know why she had been over there. Defendant said he told [RL] the victim had been with his cousin and that [RL] then hollered at the victim before finally leaving with some garbage bags in his hand. Defendant denied killing the victim. [*Richards I*, unpub op at pp 2-3.]

After a six-day trial, a jury acquitted defendant of first-degree premeditated murder, but it convicted defendant of second-degree murder and first-degree felony murder. The trial court sentenced defendant to a single term of mandatory life imprisonment without parole. On appeal, this Court affirmed. *Richards I*, unpub op at p 5. Defendant was 17 years old on the day the victim was last seen alive.

Then, in 2012, the United States Supreme Court held that sentencing juveniles to mandatory life without parole violates the Eighth Amendment's prohibition against cruel and unusual punishment. *Miller*, 567 US at 479. The Court held that a juvenile convicted of a homicide offense could not be sentenced to life without parole unless the sentencing court "follow[ed] a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Id*. at 483. Then, in 2016, in *Montgomery v Louisiana*, 577 US 190, 206-212; 136 S Ct 718; 193 L Ed 2d 599 (2016), the Supreme Court held that *Miller* was retroactive. The Court explained that prisoners sentenced to mandatory life imprisonment for crimes committed as juveniles "must be given the opportunity to show that their crime did not reflect irreparable corruption." *Id*. at 213. Accordingly, defendant was entitled to a new sentencing hearing. See *id*.; see also MCL 769.25a; MCL 769.25; *People v Bennett*, ___Mich App ___, ___; ___ NW2d___ (2021) (Docket No. 350649); slip op at 2.

The prosecution moved to again sentence defendant to life without parole. Defendant opposed the motion and filed several other motions, including a motion to deny a sentence of life without parole as categorically barred under the Eighth Amendment. After a three-day *Miller* hearing, the trial court entered an opinion and order thoroughly discussing the evidence and making the following findings:

An in depth review and consideration of the *Miller* case and the factors set forth therein pertaining to circumstances unique to juveniles must be considered prior to a court determining whether or not to grant a motion to sentence a convicted juvenile Defendant to life without parole. The expanse of evidence presented by

---

[1] It appears from our review of the transcripts that the cousin was actually fourteen years old.

the parties herein is extensive. A review of the entirety thereof was undertaken with purpose and solemnity.

The decision making process was far from linear in nature, requiring multiple readings, re-examination of detailed documentation and continued critical examination throughout the course of contemplation. The US Supreme Court saw fit not to weight the factors delineated in *Miller* but rather left the determination to the reviewing court to consider and apply them to the fact specific circumstances in the case before it. *Miller* falls short of barring any specific penalty for an offender class or crime type, but instead mandates the process the reviewing court is to follow prior to sentencing.

Dr [Michael] Caldwell[2], through testimony and exhibits set forth compelling information detailing the efficacy of brain science and research deducing the developing juvenile mind differs from that of an adult in areas of decision making, behavior and functioning.

During much of his youth, Defendant endured a home environment surrounded by a community of violence. Nevertheless, Defendant formed deep and lasting family bonds. He resisted the pressure of gangs and youthful temptations of drugs and alcohol, and secured and maintained employment until Defendant made the reasoned and thoughtful decision to remove himself from his undesirable environment and live with his aunt and her family in Michigan. These attachments and behavior indicate Defendant's more established sense of reason and a degree of self-disciple [sic] as opposed to recklessness or a reduced capacity to mediate his behavior due to social and family exposure.

[The victim] was an innocent child, who at the tender age of 10 was undeserving of the brutal sexual assault, which at the hands of Defendant she was made to suffer, directly causing her death. Defendant acted alone in the planning and execution of this violent sexual crime. The record is void of assertion or inference that he was motivated by his family, trying to impress friends, gain entry into a gang by rites of initiation or following the lead of any other juvenile or adult. Defendant did not succumb to pressure. Supporting the conclusion his actions were neither impetuous nor rash is the evidence Defendant calculated this offense after observing [the victim] and luring the 10 year old girl to a greater place of vulnerability to accomplish this assault. Careful review of the trial transcript supports the determination that the forceful sexual assault of [the] young [victim] was not a crime of random opportunity or chance but rather of premeditation and the execution of a deliberate design.

The excessive force and brutality executed by Defendant upon [the victim] is evidenced by the physical tear to her vagina which could not be replicated by the male pathologist applying brute force in his attempt. Further confirmation of

---

[2] Dr. Caldwell was qualified as an expert regarding psychology and adolescent brain development.

defendant's actions to be formed and intentional as opposed to impulsive or hastily made lies in the assault itself. Unlike the quick pull of a trigger or swift thrust of a knife, Defendant committed three separate and distinct acts of sexually assaultive force upon his victim. These individual assaults were not without intermission. After Defendant's vigorous vaginal assault on [the victim], rather than discontinue his attack, he orally assaulted her causing her to gag and vomit. Knowing full well the outcome of this act of violence against [the victim], defendant refused to end his attack. Instead, allowing time for her to finish regurgitating, Defendant once again forced and held his penis in her mouth, against his groin until she again vomited, suffocating to death. Experienced in summoning police help for himself and his sister, Defendant chose not to do so for [the victim]. Further evidencing a degree of sophistication at the time he committed this offense was Defendant's decisiveness in tightly wrapping [the victim]'s face, knotting and securing the plastic garbage bag, subsequently discarding her remains at a trash dumping site.

Defendant's graduated confessions support a finding that he was not a novice in dealing with law enforcement. His handwritten confession was prepared privately without police oversight. Thereafter, Defendant, on his own, initiated further police contact, providing additional details of the offense. No evidence was introduced to suggest any incompetencies of youth were responsible for Defendant's confession to his aunt, subsequently, recanted the following day. Ultimately, Defendant testified in his own defense at trial.

While incarcerated Defendant has obtained a GED, completing programs and receiving promotions through MDOC employment. Within the structured setting of prison confinement his progress, as noted in MDOC records and risk assessments, led Mr. [Richard] Stapleton[3] to conclude Defendant would be favorably considered for parole and Dr. Caldwell to opine Defendant has developed a more positive character and would not criminally reoffend.

In contrast to Mr. Stapleton's opinion and Dr. Caldwell's report is the MDOC COMPAS Narrative Assessment Summary supporting a finding Defendant's capacity to change is suspect, noting Defendant's probable attitude problems, including moral justification for his criminal behavior, refusal to accept responsibility and victim blaming. While Dr. Caldwell espoused Defendant's full acceptance of responsibility and expression of remorse for the murder of [the victim], Defendant's telephone conversation with his girlfriend[4] indicates otherwise as he recruited her compliance for the purpose of a successful ruling at

---

[3] Stapleton was qualified as an expert regarding policies and procedures of the Michigan Department of Corrections.

[4] The trial court provided several excerpts from a recording of a 2016 telephone conversation between defendant and his girlfriend that it characterized as "challenging" the "authenticity of Defendant's subsequent acceptance of responsibility and expression of remorse." The contents of the conversation will be discussed in more detail below.

his *Miller* hearing. Any acknowledgment of responsibility or expression of remorse for his murder of [the] 10 year old [victim] is completely lacking . . . This behavior undermines the authenticity of Defendant's more recent expressions of remorse and accountability.

Demonstrating Defendant's present lack of aversion to risk taking behavior is his misconduct ticket for prohibited sexual contact with a female visitor occurring in March of 2019, only months before the inception of these proceedings. With full appreciation of the importance and consequences of a *Miller* hearing, Defendant made the fully informed choice to engage in risky sexual conduct realizing this major violation of prison rules, upon discovery, would result in a misconduct ticket that would ultimately be reviewed by the court in contemplation of its final sentencing decision. Although not criminal in nature, this intentional behavior by Defendant at age 49 supports the finding that any propensity Defendant may have had for risk taking and impetuosity were not merely temporal, transient behaviors attributable to youth.

The trial court therefore granted the prosecution's motion, sentencing defendant to life without parole. Defendant now appeals that sentence.

## II. LIFE-WITHOUT-PAROLE SENTENCE

Defendant argues that the trial erred in its consideration of the *Miller* factors and abused its discretion by resentencing him to life imprisonment without parole. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

This Court reviews for an abuse of direction a trial court's decision to impose a sentence of life without parole. *People v Skinner*, 502 Mich 89, 137; 917 NW2d 292 (2018). A sentencing court abuses its discretion when it chooses an outcome outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "Because of the trial court's familiarity with the facts and its experience in sentencing, the trial court is better situated than the appellate court to determine whether a life-without-parole sentence is warranted in a particular case." *Skinner*, 502 Mich at 134 (quotation marks and citation omitted).

As discussed earlier, in 2012, the United States Supreme Court held that sentencing a juvenile to mandatory life without parole violates the Eighth Amendment's protection against cruel and unusual punishment. *Miller*, 560 US at 479. A few years later, the Supreme Court made *Miller* retroactive. *Montgomery*, 577 US at 206-213. The *Montgomery* Court explained that "[t]he opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Id*. at 212. "Although *Miller* did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect 'irreparable corruption.' " *Id*. at 195 (quotation marks and citation omitted).

Recently, this Court explained that our Legislature codified procedures to handle *Miller* cases as follows:

Anticipating that the United States Supreme Court would give *Miller* retroactive effect, Michigan's Legislature designed a system for resentencing all prisoners serving life without parole who were under the age of 18 when they committed the offense. MCL 769.25a. In such cases, the resentencing court must select either life without parole or a term-of-years sentence. MCL 769.25a(2). Prosecutors seeking imposition of a life-without-parole sentence are obligated to file a motion specifying the grounds for imposing that punishment. MCL 769.25a(4)(b). The resentencing court then must hold a hearing to consider the juvenile sentencing factors set forth in *Miller* and other relevant information, including the defendant's "record while incarcerated." MCL 769.25(6). The court is additionally obligated to "specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed." MCL 769.25(7). If the court elects a term-of-years sentence rather than life without parole, "the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years." MCL 769.25(9). . . .

At a resentencing hearing, MCL 769.25 requires that the judge take into account the "hallmark features" of youth, known as the *Miller* factors. The *Miller* factors developed from the Eighth Amendment proportionality principles described by the United States Supreme Court in other decisions involving juvenile sentencing: *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005), and *Graham v Florida*, 560 US 48, 68; 130 S Ct 2011; 176 L Ed 2d 825 (2010). The Court observed in *Graham* and repeated in *Miller* that "[t]he concept of proportionality is central to the Eighth Amendment." *Graham*, 500 U.S. at 59; *Miller*, 567 US at 469. That concept, the Court emphasized in *Miller*, must be viewed in a manner that gives meaning to "the evolving standards of decency that mark the progress of a maturing society." *Miller*, 567 U.S. at 469 (quotation marks and citations omitted). [*Bennett*, ___ Mich App at ___; slip op at 2.]

In *Skinner*, 502 Mich at 114-115, our Supreme Court summarized the *Miller* factors, as follows:

(1) his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional; (3) the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him; (4) whether he might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys; and (5) the possibility of rehabilitation. [Quotation marks and citation omitted.]

However, the United States Supreme Court also recently clarified:

-7-

In short, *Miller* followed the Court's many death penalty cases and required that a sentencer consider youth as a mitigating factor when deciding whether to impose a life-without-parole sentence. *Miller* did not require the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence. And *Montgomery* did not purport to add to *Miller*'s requirements. [*Jones v Mississippi*, ___US___; 141 S Ct 1307, 1316; 209 L Ed 2d 390 (2021) (footnote omitted).]

## B. HALLMARK FEATURES OF AGE AND HOME ENVIRONMENT

The first two *Miller* factors are consideration of the "hallmark features" of defendant's age at the time he committed the offense, and defendant's family and home environment. Defendant was 17 years old when he committed the offense. Therefore, he was (and until October 1, 2021, still is) considered to have been an adult for purposes of criminal prosecution and criminal responsibility. See 2019 PA 98, 2019 PA 99, 2019 PA 100, 2019 PA 101, 2019 PA 102, 2019 PA 103, 2019 PA 104, 2019 PA 105, 2019 PA 106, 2019 PA 107, 2019 PA 108, 2019 PA 109, 2019 PA 110, 2019 PA 113, 2019 PA 114. The record supports the trial court's findings that defendant refrained from drugs, alcohol, and gangs. It reflects that defendant maintained jobs when he lived in Chicago. And it reflects that his aunt described him as helpful, obedient, and seemingly responsible when he lived in Benton Harbor. The trial testimony also includes evidence that defendant premeditated his sexual assault on the victim when he formulated the scheme with his cousin, asked for a plastic bag, and walked off with the victim's brother's truck.

The trial court recognized that defendant was exposed to crime, violence, and abuse during his formative years, which would undoubtedly have harmed his ability to interact normally with the world around him. Notwithstanding those negative experiences, defendant displayed a "sense of family loyalty and duty," continued to maintain a good relationship with his sister, and on one occasion while in Chicago displayed "both the presence of mind and sense of responsibility to warn his younger sister that someone was breaking into the residence, place a mattress over her head and phone the police for assistance." Defendant recognized his need for a better environment and moved to Michigan because he "wanted a fresh start." The trial court also expressly considered scientific evidence from Dr. Caldwell regarding juvenile brains' diminished ability to resist social influences or understand maladaptive environments. It nevertheless also observed that Dr. Caldwell admitted that defendant "was never in a position where he simply was unable to control his behavior at all," and defendant also admitted that his "assault was not a result of an uncontrollable compulsion." Furthermore, "neither Defendant's father nor any of his siblings have ever been arrested for a criminal offense."

The trial court clearly did not ignore the evidence of abuse and dysfunction in defendant's mother's home. It is readily apparent that the trial court carefully considered the evidence and recited key facts and conclusions offered by witnesses as it explained its decision at sentencing. As the prosecution points out, *Miller* only commands that a sentencer follow a certain process, not that they accept a defendant's presentation. *Miller*, 567 US at 479-480. *Miller* does not suggest that the trial court cannot, as it did, consider the full picture of defendant's youth: he held jobs, his aunt described him well, and he was able to resist some large negative elements (drugs, alcohol, and gangs). The fact that defendant disagrees with the trial court's determination that these details show sophistication and not rash actions of an impetuous juvenile do not mean that the trial court's

determination was outside of the bounds of reasonable and principled outcomes. The trial court did not abuse its discretion when it found these factors not to mitigate against a life sentence.

## C. CIRCUMSTANCES OF THE OFFENSE

The third *Miller* factor is the circumstances of the offense. Although the trial court's description of defendant's perpetration of the sexual assault and killing of the victim was arguably presented in a somewhat colorful manner, defendant expressly agrees that the circumstances of the offense were "indisputably heinous." Indeed, no other conclusion is conceivable. Defendant argues, however, that the trial court improperly concluded that defendant acted with "premeditation." He points out, accurately, that he was acquitted of first-degree premeditated murder. Although the trial court specifically stated at one point that defendant's "attack" was premeditated and deliberate, it is unambiguous from context that the trial court was referring to the sexual assault rather than the murder. Defendant argues that the sexual assault was not premeditated, but rather was a product of emotional arousal that would have impaired his ability to engage in judgment and impulse control, and further that he was influenced in some way by his younger cousin. We disagree.

Initially, the cousin's role in the events of April 20, 1987, is not entirely clear, especially given the numerous shifts in defendant's own versions of what occurred. More importantly, defendant relies heavily on Dr. Caldwell's testimony about the cousin's *possible* influence, but in so doing, defendant overstates Dr. Caldwell's conclusion. Dr. Caldwell testified that the cousin's influence "would have potentially played some role" in defendant's actions and that he "wouldn't rule it out entirely." Even in defendant's renditions, his cousin never encouraged him to commit his crime: pressuring the victim into sex was defendant's idea. Therefore, the trial court's statement that "[e]vidence of pressure from or persuasion by family and friends is not existent" is a reasonable outcome and principled determination. Third, the trial court's reliance on defendant's "premeditation," as it called it, is supported by the record. The trial court never suggested that defendant planned to kill the victim; instead, it found that defendant planned his sexual assault on the victim by watching her for an extended period of time, isolating her from the safety of her siblings, and luring her into his house. The trial court's conclusion is supported by the trial testimony, and in particular defendant never accounts for the victim's brother's toy truck and how he used it to lure the victim into his house. The trial court did not abuse its discretion on this factor.

## D. INCOMPETENCIES OF YOUTH

The fourth *Miller* factor is "incompetencies of youth," which, in contrast to the first factor, refers more particularly to whether a juvenile might have brought harsher charges upon him- or herself due to an inability to effectively communicate with, interact with, or otherwise handle police officers, prosecutors, or defense counsel. The trial court recognized that defendant's trial counsel thought defendant to be "immature and not particularly sophisticated," and that defendant had not been "very helpful in formulating a defense" as a result. The trial court noted that defendant had been found competent to stand trial by a forensic examiner, which defendant reasonably points out is a low bar to overcome. Nevertheless, the trial court did not appear to weigh that finding heavily. Rather, the trial court appears to have relied primarily on the fact that defendant had nine prior arrests, one of them serious, and he had been twice placed on probation for different offenses. It found defendant's experiences therefore gave him some familiarity with

both criminal procedure and the consequences of criminal conduct. The trial court's finding is supported by the evidence and is not unprincipled.

Defendant argues that his experience with juvenile proceedings did not give him experience with adult criminal proceedings. Defendant misses the essential point that his age had not shielded him from any familiarity with police and court processes. The facts that he agreed to take a polygraph, agreed to talk to the police, and seemingly failed to truly appreciate the consequences of his prior crimes because he kept committing them have little to do with his youth, given how many adults routinely waive their rights or reoffend. The issue is not whether defendant was particularly sophisticated or unsophisticated in the abstract, but rather the likelihood that he would have been charged or convicted of a lesser offense because of a lack of sophistication specifically due to his youth. We find no error by the trial court regarding this factor.

### E. POSSIBILITY OF REHABILITATION

The final *Miller* factor is defendant's capacity for rehabilitation. We find that the trial court did not err in its evaluation of this factor.

The trial court recognized that defendant had obtained a GED, performed work assignments, received promotions and positive reviews, and been described by Dr. Caldwell as cooperative and nonviolent. It recognized that out of defendant's 29 major misconduct tickets, only three occurred within the last 15 years. However, it expressed concern that one of those major misconduct tickets, which was nonviolent but constituted "class one" sexual misconduct, had occurred only 6 months before his *Miller* hearing. Moreover, defendant knew that he was openly defying prison rules, and he did so in full view of prison guards and security cameras. The trial court reasonably found that this major misconduct undermined defendant's testimony that he did not "do stupid things anymore" and "follow[ed] the rules." It also noted that when the misconduct was brought to his attention, he "chose initially to rationalize and excuse his behavior." The trial court was appropriately concerned that defendant engaged in misconduct despite knowing he needed to be on his best behavior.

Of further concern was a telephone call made by defendant to his girlfriend on October 25, 2016.[5] As the trial court fairly summarized, much of the conversation entailed defendant explaining to his girlfriend that he had to "push all the right buttons and pull all the right levers," largely referring to "what they want to hear." The girlfriend opined that "[i]t seems like a scam to me," expressed concern about people being "wise enough to see when they getting played," and strongly suggested that defendant had for at least eight years represented to her that he did not actually commit the crime for which he was incarcerated. Defendant did not correct the girlfriend, saying instead that the matter was not about guilt or innocence, but rather about putting on a

---

[5] The girlfriend was apparently the same person involved in the 2019 misconduct incident. The telephone call was played for the trial court, and the trial court quoted extensive excerpts from the call in its opinion and order, but we cannot find any transcript of the entire call in the lower court record or provided to us on appeal. In any event, although defendant generally argues that the trial court cherry-picked evidence, he does not challenge the fairness or representativeness of the trial court's excerpts from the telephone conversation.

presentation of seeming to accept responsibility and showing remorse. The trial court recognized that Dr. Caldwell was unwilling to accept that defendant was lying and merely trying to engineer his release from incarceration, but had nevertheless admitted that it was "possible." The trial court clearly, and appropriately, concluded that defendant's own conduct—of committing a major sexual misconduct violation and trying to solicit his girlfriend's assistance in carrying on a sham—was the most probative evidence of defendant's true degree of rehabilitation.

Therefore, we conclude that the trial court did not abuse its discretion on this factor.

## F. CONCLUSION

Defendant argues, in effect, that the trial court should have accepted Dr. Caldwell's and Stapleton's assessments of defendant, and that the trial court unfairly cherry-picked evidence. We disagree. The trial court properly and thoughtfully assessed the entirety of the evidence, and it identified numerous concerns that undermined the glowing reviews from Dr. Caldwell and Stapleton. It was entirely appropriate for the trial court to consider whether defendant's purported reformation was a sham, or would collapse when he was no longer in a highly-controlled environment. For the reasons discussed, the trial court did not abuse its discretion when, after considering evidence on the potentially mitigating *Miller* factors and articulating its reasoning on the record, it again imposed a sentence of life without parole. The trial court's determination is within the range of reasonable and principled outcomes, and the sentences do not violate the principle of proportionality. *Skinner*, 502 Mich at 131-132.[6]

## III. CRUEL AND UNUSUAL PUNISHMENT

Defendant also argues that life without parole for juvenile offenders is categorically barred by the federal and state constitutions because such a sentence constitutes cruel and unusual punishment. In the alternative, defendant presents an as-applied constitutional challenge to his sentence under the same theory. Although we recognize defendant's arguments, we are bound by *People v Carp*, 496 Mich 440, 518, 520-521; 852 NW2d 801 (2014), in which our Supreme Court rejected these arguments. See *People v Beasley*, 239 Mich App 548, 556; 609 NW2d 581 (2000).

Affirmed.

/s/ Amy Ronayne Krause
/s/ Jane M. Beckering
/s/ Mark T. Boonstra

---

[6] Because we affirm defendant's sentence, we need not consider defendant's argument that a different judge must be assigned at resentencing.